**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**JEREMY JONES**                                                **CIVIL ACTION**

**versus**                                                           **NO. 10-213**

**BURL CAIN, WARDEN**                                    **SECTION: "R" (1)**

<u>**REPORT AND RECOMMENDATION**</u>

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

<u>I.  Procedural History</u>

Petitioner, Jeremy Jones, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On May 16, 2001, he was convicted of second-degree murder in

violation of state law.[1]  On October 24, 2001, he was sentenced to a term of life imprisonment

without benefit of parole, probation, or suspension of sentence.[2]  On October 16, 2002, the Louisiana

Fourth Circuit Court of Appeal affirmed that conviction and sentence.[3]  The Louisiana Supreme

Court then denied petitioner's related writ application on September 19, 2003.[4]

On June 3, 2004, petitioner filed with the state district court an application for post-

conviction relief,[5] which was later supplemented by counsel.[6]  After an evidentiary hearing on April

24, 2008,[7] that application was denied on June 6, 2008.[8]  Petitioner's related writ applications were

---

[1]  State Rec., Vol. V of VII, transcript of May 16, 2001, p. 37; State Rec., Vol. III of VII, minute entry dated May 16, 2001; State Rec., Vol. II of VII, jury verdict form.

[2]  State Rec., Vol. V of VII, transcript of October 24, 2001; State Rec., Vol. III of VII, minute entry dated October 24, 2001.

[3]  State v. Jones, No. 2002-KA-0431 (La. App. 4th Cir. Oct. 16, 2002) (unpublished); State Rec., Vol. I of VII.

[4]  State v. Jones, 853 So.2d 634 (La. 2003) (No. 2002-KO-3117); State Rec., Vol. VII of VII.

[5]  State Rec., Vol. I of VII.

[6]  State Rec., Vol. I of VII.

[7]  State Rec., Vol. I of VII, transcript of April 24, 2008.

[8]  State Rec., Vol. I of VII, Judgment dated June 6, 2008; State Rec., Vol. III of VII, minute entry dated June 6, 2008.

then likewise denied by the Louisiana Fourth Circuit Court of Appeal on October 21, 2008,[9] and by the Louisiana Supreme Court on October 9, 2009.[10]

On December 13, 2009, petitioner filed the instant federal application for *habeas corpus* relief.[11] In support of his application, he asserts the following claims:

1. Petitioner's attorney prevented him from testifying at trial;

2. The prosecution withheld impeachment evidence from the defense; and

3. Petitioner received ineffective assistance of counsel.

The state concedes that the federal application is timely and that petitioner exhausted his state court remedies.[12]

## II. Motion to Stay

Before turning to the federal application, the Court notes that petitioner has also filed a motion to stay these proceedings.[13] The state opposes that motion.[14]

---

[9] State v. Jones, No. 2008-K-1017 (La. App. 4th Cir. Oct. 21, 2008) (unpublished); State Rec., Vol. III of VII.

[10] State v. Jones, 19 So.3d 7 (La. 2009) (No. 2008-KP-2780). While that application was pending, petitioner returned to the state district court to file a motion to quash the indictment on March 2, 2009. State Rec., Vol. I of VII. That motion was denied on May 6, 2009. State Rec., Vol. I of VII, Judgment dated May 6, 2009.

[11] Rec. Doc. 1.

[12] Rec. Doc. 19, p. 4.

[13] Rec. Doc. 21.

[14] Rec. Doc. 23.

In Rhines v. Weber, 544 U.S. 269 (2005), the United States Supreme Court explained that, in limited circumstances, it is appropriate for a federal district court to stay *habeas corpus* proceedings. In Rhines, the petitioner had filed a "mixed petition" containing both exhausted and unexhausted claims. He wanted to stay the federal proceedings, return to state court to pursue his unexhausted claims, and then come back to federal court for review of his perfected petition. The Supreme Court noted that the entry of a stay is permissible in such proceedings but noted:

> Staying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings. It also undermines AEDPA's goal of streamlining federal habeas proceedings by decreasing a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition. Cf. Duncan [v. Walker, 533 U.S. 167, 180 (2001)] ("[D]iminution of statutory incentives to proceed first in state court would ... increase the risk of the very piecemeal litigation that the exhaustion requirement is designed to reduce").
>
> For these reasons, stay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. Cf. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

Rhines, 544 U.S. at 277.

In the instant case, petitioner recently procured an affidavit from Maria Courtney in which she states that James Meche confessed to her that he was the person who killed the victim in this case. Based on that affidavit, petitioner wants to file a new post-conviction application in state

court. He also wants these federal court proceedings stayed during those state court proceedings so that, if those proceedings prove unsuccessful, he can add his new claims to the instant petition for this Court's review. However, even if petitioner could show good cause for the delay here, which is doubtful,[15] a stay still would not be warranted because the potential claims he wishes to pursue are plainly meritless for the following reasons.

To the extent that petitioner is claiming that the affidavit bolsters his previously rejected claim that defense counsel was ineffective for failing to call Courtney to testify at trial, that claim has no merit. In the affidavit, Courtney stated that James Meche told her that "he was in a fight and SHOT some 'dude' who robbed his house where he lived with his 'old man', 'Steve' and that Jeremy Jones was going to tell on him, (James Meche) — James Meche also told me that he was Bi-Sexual and that 'Steve' was his lover."[16] Courtney further stated:

> A few weeks after Jeremy Jones was arrested for murder, I attempted
> to contact Jeremy Jones' attorney during one of Jeremy's pre trial
> motions. I saw the Assistant District Attorney and asked to speak to
> her because I wanted to speak to her and tell her that Jeremy Jones
> was at the same Club that I worked that night and that "he, (Jeremy
> Jones), did NOT kill any one, but that James Meche did"! She, (The
> ADA), told me that she was busy at the moment and would talk to me
> later. I gave her my business card and cell phone number and she

---

[15] Petitioner has long argued that he informed his counsel prior to trial that Maria Courtney should be called to testify and that his counsel was ineffective for failing to subpoena her. Based on that fact, it is logical to infer that petitioner has known all along that Courtney would testify that Meche had confessed to her. Petitioner has not explained why he waited until June 20, 2010, more than *nine years* after his trial, to have Courtney execute an affidavit to that effect.

[16] Rec. Doc. 21, p. 8.

gave me hers.  I called her Office several times after that, but she never returned my calls.[17]

In that affidavit, Courtney does *not* indicate that she ever gave this information to *defense counsel*; rather, she indicates that she spoke only to the *Assistant District Attorney*. Petitioner has never brought forth any evidence that he or Courtney ever made defense counsel aware of Meche's alleged confession to Courtney.  Without such evidence, this Court cannot find that defense counsel performed deficiently in failing to call Courtney to testify.  Therefore, his ineffective assistance claim based on the affidavit has no merit.

To the extent that petitioner is contending that the affidavit constitutes newly discovered evidence proving that he did not commit the murder of which he stands convicted, that would be an independent claim of actual innocence.  However, claims of actual innocence are not cognizable in federal *habeas corpus* proceedings.  As Justice Holmes noted long ago, what a federal *habeas* court has "to deal with is *not* the petitioner['s] innocence or guilt but *solely* the question whether [his] constitutional rights have been preserved."  Moore v. Dempsey, 261 U.S. 86, 87-88 (1923) (emphasis added).  The Supreme Court reiterated that view seventy years later, noting:

> Claims of actual innocence based on newly discovered evidence have *never* been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. ... This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – *not* to correct errors of fact.

---

[17] Rec. Doc. 21, p. 8.

Herrera v. Collins, 506 U.S. 390, 400 (1993) (emphasis added); see also Kincy v. Dretke, 92 Fed. App'x 87, 92 (5th Cir. 2004); Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir. 1998); Bolton v. Cooper, Civ. Action No. 07-626, 2007 WL 2713259, at *4 (E.D. La. Sept. 14, 2007). Where, as here, a convicted inmate uncovers new evidence tending to prove his innocence, his recourse is to seek executive clemency, not federal *habeas corpus* relief. Herrera, 506 U.S. at 417.

Accordingly, for all of these reasons, petitioner's motion to stay should be **DENIED**. Therefore, the Court will proceed to a review of the claims asserted in the original federal application.

### III. Standards of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of law and fact. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and pure questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28

U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Courts cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an incorrect one."  <u>Bell</u>, 535 U.S. at 694.

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

### IV.  Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> Detective Doug Eckert testified that on December 17, 2000, he went to 5521 West End Boulevard in response to a call that a white male, later identified as T.J. Emfinger, had suffered a gunshot wound to the head.  He found the body between a brick wall and a fence.  The victim was missing his cell phone and wallet.  Eckert spoke to Eula Crews, 5523 West End Boulevard, and Cornell Goldman.  From Goldman, he learned that a blue pickup truck had been used in the crime.  He subsequently determined that Jack Valian was the owner of the truck.  He showed a photographic lineup to Crews, who identified the defendant.  She also told him the truck looked similar to the one used in the crime.
> Valian said the defendant borrowed his truck twice the night of the crime, first at 6:00 p.m., returning it early in the evening, and then again at 10:00 or 11:00 p.m., returning it at midnight.
> Crews said she was in her driveway at 11:30 p.m. the night of the killing, unloading Christmas presents from her car.  Crews lives

alone and was being very vigilant of the surrounding area as she completed her task. She saw the blue pickup truck that she recognized as one that commonly visited her upstairs neighbors. Jeremy Jones, the driver, and a man she did not recognize got out of the truck and walked past her. Jones had both of his hands in his pockets. The other man got one of his shoes stuck in the mud and "fussed a little," but proceeded to catch up with Jones. There was no apparent aggression between the men, and they talked as friends. The two walked between two houses. Immediately, Crews heard three pops. Jones ran past her "looking scared," jumped into the truck, and "squealed off." The other man never came out from between the houses. Crews went into her house and called 911. She had taken particular notice of the two men, and knew she knew Jones. She was confident of her identification and said the lighting was good in the area. She positively identified the defendant at trial and identified the photograph of him she had chosen in a lineup.

Charles Thomas Russell said he had an apartment on West End Boulevard that he shared with Carnel Goldman and Gary Ray Brewster, a.k.a. Kristen. He saw the defendant in Oz, a French Quarter bar, in the early morning hours of Sunday, December 17, hours after the crime. The defendant told him he was sorry about something that had happened next to Russell's house. Russell told him that he did not want to know anything about it.

Russell said Detective Eckert had come to his house after the murder, but that he knew nothing about it at the time. Later, Eckert brought over a picture of the victim, and Russell identified the victim. After that, Russell contacted Eckert about the statements that he remembered the defendant had made.

Cornell Goldman said that he saw the defendant, whom he knew, in Oz in the hours after the crime, and when they embraced, Goldman felt what he thought was a gun in the small of the defendant's back. The defendant told Goldman that he indeed did have a gun and that he was sorry for what had happened at Goldman's house because he did not want to bring him any "heat." Goldman thought at the time that the defendant might have assumed he and Russell had had a fight, which is why the defendant made the strange reference to their house. Goldman said he did not learn about the killing until the next day when the police arrived at his house on the West End. He did not know the victim was Emfinger until he recognized him in a picture the police showed to him. The police interviewed him several times, and after days he finally came to the

conclusion that the defendant had been talking about the murder the night he had seen him at Oz.

"Kristen" said that on the night of the crime or early the next morning, he saw the defendant at The Bourbon Pub. The defendant asked him if he had learned of what had happened at "the house." The defendant told him that somebody had been shot, and that he had been the shooter. Kristen then went to Oz to meet Goldman and Russell. They said they knew about the shooting because the defendant had told them about it. The next day he learned about the discovery of the body, and he went to West End Boulevard. At some point, detectives asked him if he would help get the defendant arrested. He said he was sure he would see the defendant because he saw him every night. When he saw the defendant at The Bourbon Pub, he asked him where he was going, and he called the detectives to tell them that the defendant was on his way to Good Friends, another French Quarter bar. Detective Eckert later arrested the defendant in the 700 block of Dauphine Street as he was driving the blue pickup.[18]

## V.  Right to Testify

Petitioner's first claim is that he was prevented from testifying in his own behalf at trial by his counsel, Adgia Lambert. At the post-conviction evidentiary hearing, petitioner testified as follows:

> Q.    Did you testify at trial?
>
> A.    No, I did not.
>
> Q.    And why not?
>
> A.    Because Adgia told me she was not putting me on the stand and letting me blow her case.
>
> Q.    Did she indicate that you had a right to testify?

---

[18]    State v. Jones, No. 2002-KA-0431, at pp. 1-4 (La. App. 4th Cir. Oct. 16, 2002) (unpublished); State Rec., Vol. I of VII.

A.      No, she did not.

Q.      What conversations did you have with her regarding you testifying?

A.      Well, really it was kind of short.  I mean, I told her I wanted to testify because my testimony would be the only thing to substantiate my claim.  And she told me that she was not putting me on the stand letting me blow her case.[19]

The state district judge thereafter rejected petitioner's claim, holding:

[T]his Court will address Jones's claim that trial counsel would not let him testify.  Simply put, this Court does not believe Mr. Jones's testimony on this point.  Over the lengthy period of time that trial counsel served as one of the public defenders in Section "I," this Court recalls that she scrupulously safeguarded the constitutional rights of her clients.  While she may well have advised Mr. Jones that calling him as a witness was inadvisable for a variety of reasons, this Court refuses to accept his testimony that she forbade him from taking the stand.[20]

The claim was then likewise rejected by the Louisiana Fourth Circuit Court of Appeal[21] and by the

Louisiana Supreme Court.[22]

    "[I]t cannot be doubted that a defendant in a criminal case has the right to take the

witness stand and to testify in his or her own defense."  Rock v. Arkansas, 483 U.S. 44, 49 (1987).

However, petitioner has offered nothing other than his own self-serving testimony in support of his

---

[19]   State Rec., Vol. I of VII, transcript of April 24, 2008, p. 5.

[20]   State Rec., Vol. I of VII, Judgment dated June 6, 2008, p. 4.

[21]   State v. Jones, No. 2008-K-1017 (La. App. 4th Cir. Oct. 21, 2008) (unpublished); State Rec., Vol. III of VII.

[22]   State v. Jones, 19 So.3d 7 (La. 2009) (No. 2008-KP-2780).

allegations. He does not allege and the record does not suggest that he ever made known to the trial court that his counsel was refusing to allow him to testify despite his stated desire to do so. Of course, the mere fact that petitioner failed to stand up in open court and insist on testifying should not be dispositive of the issue. See United States v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002); see also United States v. Araujo, 77 Fed. App'x 276 (5th Cir. 2003). Nevertheless, the Court cannot ignore the fact that petitioner has never presented *any* evidence either to the state courts or to this Court to corroborate his allegations. Without more, petitioner's allegations are insufficient to trigger either the granting of relief or further fact-finding by this Court. As the United States Seventh Circuit Court of Appeals noted in a case in which a petitioner alleged that he had been denied the right to testify by his counsel:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...
> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); see also Richthofen v. Cain, Civ. Action No. 05-5701, 2008 WL 630477, at *44-45 (E.D. La. Mar. 7, 2008); Curtis v. Cain, Civ. Action No.

06-1676, 2008 WL 482849, at *8-9 (E.D. La. Feb. 13, 2008); Baker v. Cain, Civ. Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D. La. July 26, 2007); White v. Cain, Civ. Action No, 06-1576, 2006 WL 3703240, at *4-5 (E.D. La. Dec. 11, 2006); Turcios v. Dretke, No. Civ. A. H-97-0515, 2005 WL 3263918 (S.D. Tex. Nov. 29, 2005). This Court finds that, in light of the complete lack of evidentiary support for petitioner's contention, he has failed to meet his burden to establish that he is entitled to relief. Accordingly, this claim should be denied.

## VI. Brady Violation

Petitioner next claims that the prosecution withheld impeachment evidence from defense in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. The substantive law regarding such claims is clear. The United States Supreme Court has held:

> A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.

Youngblood v. West Virginia, 547 U.S. 867, 869-70 (2006) (per curiam) (internal citations and quotation marks omitted).

In the instant case, the state district court rejected petitioner's Brady claim, holding: "[N]o evidence was adduced as to the claim that the state failed to turn over potential impeachment evidence on a crucial state witness. Consequently, [this claim is] without merit."[23] The claim was

---

[23] State Rec., Vol. I of VII, Judgment dated June 6, 2008, p. 3.

then likewise rejected by the Louisiana Fourth Circuit Court of Appeal[24] and by the Louisiana

Supreme Court.[25]

The AEDPA places severe limitations on this Court's review of that state court

decision.  The United States Fifth Circuit Court of Appeals has cautioned:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a Brady violation.  See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter."); Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect.").  Rather, [a federal court] decide[s] whether the state court's Brady determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law.  Busby v. Dretke, 359 F.3d 708, 717 (5th Cir. 2004).

Dickson v. Quarterman, 462 F.3d 470, 477-78 (5th Cir. 2006).  For the following reasons, it is

evident that the state court in fact properly denied this claim.

In this case, petitioner contends that the prosecution failed to reveal that one of the

state's key witnesses, Gary "Kristen" Brewer, was under investigation for drug distribution.

Petitioner further speculates that Brewer was offered favorable treatment with respect to his future

criminal charges in exchange for his testimony against petitioner.  However, the record does not

support those contentions.

---

[24]  State v. Jones, No. 2008-K-1017 (La. App. 4th Cir. Oct. 21, 2008) (unpublished); State Rec., Vol. III of VII.

[25]  State v. Jones, 19 So.3d 7 (La. 2009) (No. 2008-KP-2780).

The history of Brewer's legal troubles was explored in detail in connection with a hearing on petitioner's motion for a new trial on August 29, 2001.[26]  According to the testimony of police officers at that hearing, a confidential informant told police on May 15, 2001, that Edward Stover was selling drugs out of his residence.  *Only* Stover's name, not Brewer's, was made known to the police.  Acting on that information, police arranged an undercover operation to buy drugs at the residence on May 16.  When the buy was made, other people were also present at the address *but their names were unknown to the police*.  A second undercover buy was made on May 29, and then police conducted a search of the residence on May 30.  Police ultimately arrested Stover and Brewer, who also lived at the residence, on drug charges.  As of the August 29 hearing, the District Attorney had not accepted the charges for prosecution, and Stover and Brewer had been released without bond.

Based on the foregoing, it is clear that there was no Brady violation because Brewer's identity and his involvement in the drug transactions were not known to police or the prosecutor until *after* petitioner's trial concluded on May 16, 2001.  See United States v Jones, 399 F.3d 640, 647 (6th Cir. 2005) (evidence not existing at the time of trial is not Brady material); see also United States v. Rouse, 410 F.3d 1005, 1010 (8th Cir. 2005) ("Any knowledge gained by the prosecution *after* the trial is irrelevant to a Brady claim.").  Therefore, petitioner has failed to demonstrate that the state court's decision denying his Brady claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United

---

[26]  A transcript of that hearing is included in volume V of the state court record.  The motion for a new trial was ultimately denied on October 24, 2001.  State Rec., Vol. V of VII, transcript of October 24, 2001, pp. 2-3; State Rec., Vol. III of VII, minute entry dated October 24, 2001.

States.  Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claim.

## VII.  Ineffective Assistance of Counsel

Petitioner also claims that he received ineffective assistance of counsel.  The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993)

(quoting <u>Strickland</u>, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. <u>See</u> <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id</u>. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." <u>Crockett</u>, 796 F.2d at 793.

Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002). For the following reasons, the Court finds that neither of those conditions is met in the instant case.

In rejecting petitioner's claim, the state district court first correctly set forth the general law concerning such claims:

On an application for post-conviction relief the defendant bears the burden of proof. ... Mr. Jones contends that defense counsel was ineffective, thereby violating his Sixth Amendment rights. An ineffective assistance claim is assessed by the two prong test

established in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed 2d 674 (1984). First, the defendant must show that counsel's performance was deficient, i.e. that he made mistakes so serious that he was not functioning as the counsel guaranteed to a defendant by the Sixth Amendment. Secondly, one must show that the deficiency prejudiced him. This showing can only be made if the defendant can show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. At 693, 104 S. Ct. 2068. In <u>State v. Lacaze</u>, 824 So.2d 1063, 1999-0584 (La. 1/25/02), the Louisiana Supreme Court observed that the Sixth Amendment does not guarantee "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance." Further, the Court advised that "judicial scrutiny must be 'highly deferential'" and that "courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[27]

The state district court then addressed each of petitioner's allegations in turn. This Court will do likewise.

Petitioner first alleges that counsel was ineffective for failing to interview and call April LeBlanc, Maria Courtney, Jennifer Reynolds, and Dr. Angela Burton to testify at trial. In denying this claim, the state district court held:

> Mr. Jones ... accuses trial counsel of not adequately investigating the matter and not calling crucial witnesses. This Court has a different recollection [of] trial counsel's pre-trial preparation: she thoroughly investigated and prepared for trial and provided Jones with a spirited defense. Also, given the testimony provided by April Leblanc at the evidentiary hearing, it seems to this Court that counsel made a well reasoned decision not to call the witnesses named by Jones in his application. Ms. Leblanc recalled that she was under the influence of heroin on the night in question, and that her memory of seeing Jones in a club after the murder is "hazy." She also recalled seeing Jones in the Hustler Club, while Jones testified that they saw

---

[27] State Rec., Vol. I of VII, Judgment dated June 6, 2008, pp. 1-2.

one another in the Maiden Voyage strip-tease club. Ms. Leblanc also said that Jennifer Reynolds, another witness that Jones wanted counsel to call at the trial, was likewise strung out on heroin on the night of T.J. Emfinger's murder. All in all, the witnesses that Jones wanted trial counsel to call at trial were questionable at best and counsel's strategic decision not to call them will not now be second guessed.[28]

For the following reasons, it is evident that decision was neither contrary to nor involved an unreasonable application of clearly established federal law.

As a preliminary matter, the Court notes that petitioner's allegation that defense counsel failed to interview these potential witnesses is directly contrary to his sworn testimony at the post-conviction evidentiary hearing. At that hearing, petitioner testified as follows:

> Q.     And did you give [Adgia Lambert, defense counsel,] names of any witnesses?
>
> A.     Yes, I did.
>
> Q.     And who – who were those names; is [sic] you can recall?
>
> A.     April, Maria and Jennifer.
>
> Q.     April whom?
>
> A.     LeBlanc, Maria Courtney, and Jennifer Reynolds, along with Doctor Burton, Angela Burton.
>
> Q.     To your knowledge did Adgia ever talk to these individuals?
>
> A.     *Yes.*[29]

---

[28] State Rec., Vol. I of VII, Judgment dated June 6, 2008, pp. 3-4.

[29] State Rec., Vol. I of VII, transcript of April 24, 2008, p. 4 (emphasis added).

Moreover, as noted below, petitioner has not established that defense counsel was ineffective for failing to call these witnesses to testify.

As to the failure to call Jennifer Reynolds and Dr. Angela Burton, petitioner has clearly failed to meet his burden of proof. The United States Fifth Circuit Court of Appeals has held that "complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). Therefore, to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner must show that the witness was available and would in fact have testified at trial in a manner beneficial to the defense. Id.; see also Bray v. Quarterman, 265 Fed. App'x 296, 298 (5th Cir. 2008); Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001) ("A prisoner's bald conclusory assertion that supposed 'alibi' witnesses were not called does not serve to overcome the strong presumption that his counsel's actions were reasonable.") (quotation marks omitted). Therefore, a petitioner must bring forth evidence, such as affidavits from the uncalled witness, in support of his claim. See Evans, 285 F.3d at 377; see also Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL

1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance."); <u>Daigle v. Travis</u>, Civ. Action No. 07-9425, 2008 WL 3562458, at *10 (E.D. La. Aug. 12, 2008). Petitioner has never brought forth any evidence whatsoever proving that Reynolds and Burton were available to testify at trial and would have done so in a manner beneficial to the defense. Therefore, his claim clearly fails with respect to those potential witnesses.

As to the failure to call Leblanc, the state court found that to be a well-reasoned strategic decision. Indeed, there is a strong presumption that counsel's decision regarding whether to call a witness is one of trial strategy. <u>Murray v. Maggio</u>, 736 F.2d 279, 282 (5th Cir. 1984); <u>see also</u> <u>Green v. Cockrell</u>, No. 02-20650, 2003 WL 21145722, at *2 (5th Cir. Apr. 29, 2003) ("A strategic or tactical decision not to call particular witnesses does not constitute ineffective assistance."); <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints based upon uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy ...."). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. <u>Strickland</u>, 466 U.S. at 689. That presumption is particularly applicable here. As the United States First Circuit Court of Appeals has noted:

> The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony. The witness may not testify as anticipated or the witness's demeanor or character may impress the jury

unfavorably and taint the jury's perceptions of the accused; or the
testimony, though sympathetic, may prompt jurors to draw inferences
unfavorable to the accused.

Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted).  The court continued:

Reasonably competent trial counsel might well have determined that
the best prospect for acquittal lay in discrediting the government's
witnesses, rather than presenting additional testimony which could
appear to legitimate the government's case or raise questions about
the defense not previously suggested by the government's evidence.

Id.

As the state court noted in the instant case, Leblanc's value as a witness was

questionable at best.  First, she was a heroin addict who had injected the drug on the night in

question.[30]  Second, she acknowledged that her memory of that night was "pretty vague."[31]  Third,

and most important, there is no indication whatsoever that Leblanc could have testified in a manner

beneficial to the defense.  Based on Leblanc's testimony at the post-conviction hearing, it is evident

that she had no useful information.  She testified that she saw petitioner at the Hustler Club on the

night of the murder; however, she did not know what time she saw him and she did not overhear the

specifics of his conversations that night.[32]  She also testified that "[t]here was no conversation

between me and Jeremy about what happened that night."[33]  Therefore, even if Leblanc had been

called as a witness at trial and gave this same testimony, there is absolutely no reason to believe that

---

[30]  State Rec., Vol. I of VII, transcript of April 24, 2008, pp. 18-19 and 23.

[31]  State Rec., Vol. I of VII, transcript of April 24, 2008, p. 22.

[32]  State Rec., Vol. I of VII, transcript of April 24, 2008, pp. 17-18 and 22.

[33]  State Rec., Vol. I of VII, transcript of April 24, 2008, p. 24.

the result of the proceeding would have been different.  Accordingly, petitioner was not prejudiced by counsel's failure to call Leblanc.

As to the failure to call Maria Courtney, that claim has already addressed in § II of this Report and Recommendation concerning petitioner's motion to stay.  For the reasons previously noted, petitioner has not met his burden to prove that counsel was ineffective for failing to call Courtney as a witness.

Petitioner next claims that his counsel was ineffective in failing to file a timely motion to quash the indictment.  The state district court held that counsel cannot be found to be ineffective for failing to file a motion to quash because, at best, such a motion would have led only to petitioner being reindicted.[34]  The state court is correct.  Even if counsel had filed such a motion and the indictment had been quashed, that would have served no purpose other than to delay the trial.  Given the strength of the case against petitioner, the state could have simply procured a new indictment.  Therefore, no prejudice resulted from the failure to file such a motion.  Pickney v. Cain, 337 F.3d 542, 546 (5th Cir. 2003); Parker v. Cain, 445 F.Supp.2d 685, 711 (E.D. La. 2006); Varnado v. Cain, Civil Action Nos. 02-1286, 03-753, and 03-754, 2004 WL 2984804, at *6 (E.D. La. Dec. 21, 2004).

Petitioner also claims that counsel was ineffective for moving to strike manslaughter as a responsive verdict.  In rejecting this claim, the state district court held:

> This Court is also inclined to agree with the position taken by the state in its memorandum that trial counsel's motion to strike the responsive verdict of manslaughter is not reviewable in a post-

---

[34]  State Rec., Vol. I of VII, Judgment dated June 6, 2008, p. 2.

conviction relief application given that it was a strategic decision.  It is well settled that, in a post-conviction setting, courts are not to "second-guess strategic and tactical choices made by trial counsel." State v. Myles, 389 So.2d 12, 31 (La. 1979).  Because the defense in this case was that the defendant did not commit this homicide, counsel made a strategic decision to remove the responsive verdict of manslaughter from the jury's options.  This Court will not play "Monday morning quarterback" and fault counsel for making that decision.[35]

As the state court noted, the decision to omit responsive verdicts is a valid and acceptable strategic choice.  See, e.g., Lake v. Portuondo, 14 Fed. App'x 126, 128 (2nd Cir. 2001) ("A decision to forgo a charge on lesser included offenses is strategic in nature.  Strategic choices made after reasonable investigation will seldom if ever be found wanting, because we are reluctant to second-guess matters of trial strategy simply because the chosen strategy has failed.") (internal citations and quotation marks omitted); United States ex rel. Webster v. DeTella, 965 F. Supp. 1124, 1132-33 (N.D. Ill. 1997) ("As for the decision not to offer a jury instruction on a lesser included offense, that is within the realm of trial strategy, an area in which Monday morning quarterbacking is discouraged. ... That [counsel's] strategy misfired is no proof of ineffectiveness; even the best trial attorney may misjudge trial strategy on occasion."); Smith v. Terrell, Civ. Action No. 09-3791, 2009 WL 4799190, at *7 (E.D. La. Dec. 7, 2009).  Further, such a strategy may validly be employed if defense counsel believes that he can establish reasonable doubt with respect to the charged offense:

Submission of lesser included offenses may give the jury a basis for finding a defendant guilty of a crime where the prosecution was unable to prove the elements of the original crime charged beyond a reasonable doubt.  Counsel may have appropriately wished to avoid

[35] State Rec., Vol. I of VII, Judgment dated June 6, 2008, p. 3.

> this possibility and this decision therefore did not constitute
> ineffective assistance of counsel.

Colon v. Smith, 723 F. Supp. 1003, 1008 (S.D.N.Y. 1989). Additionally, counsel's decision to strike a lesser responsive verdict may result from an equally valid strategic choice to avoid a possible compromise verdict, opting instead to try to obtain a hung jury or an outright acquittal. Williams v. Cain, Civ. Action No. 07-4148, 2009 WL 224695, at *6 n. 13 (E.D. La. Jan. 29, 2009); Jason v. Cain, Civ. Action No. 04-0882, 2006 WL 2949523, at *17 (E.D. La. Oct. 13, 2006); Parker v. Cain, 445 F.Supp.2d 685, 709 (E.D. La. 2006). Therefore, for all of these reasons, this Court cannot say that counsel performed deficiently in moving to strike manslaughter as a responsive verdict.[36] Accordingly, this claim has no merit.

Petitioner next claims that counsel was ineffective for failing to request an instruction informing jurors that a life sentence was mandatory for a second-degree murder conviction. In rejecting that claim, the state district court held:

> Insofar as applicant maintains that trial counsel was
> ineffective for her failure to apprise the jury of the mandatory life
> sentence, to agree with that position this Court would have to engage
> in speculation. That is to say that Jones's suggestion that the jury
> may have been affected by knowledge of the life sentence is

---

[36] Moreover, even if counsel's performance were found to be deficient in this respect, petitioner cannot show prejudice. There was no evidence at trial to support a finding of manslaughter; indeed, petitioner's defense was that he was not even present at the killing. Therefore, there is no reasonable probability that the outcome would have changed in this case even if manslaughter had been included as a responsive verdict. See Kubat v. Thieret, 867 F.2d 351, 365 (7th Cir. 1989); Jason v. Cain, Civ. Action No. 04-0882, 2006 WL 2949523, at *18 (E.D. La. Oct. 13, 2006); Washington v. United States, 291 F.Supp.2d 418, 442 (W.D. Va. 2003).

presumptuous and unsupported by evidence. ... Consequently, [this claim is] without merit.[37]

Under Louisiana law, "[w]hen the penalty to be imposed is a mandatory one, our law requires the trial judge to inform the jury, on request of the defendant, of the penalty and to permit defense counsel to argue the penalty to the jury." State v. Hooks, 421 So.2d 880, 886 (La. 1982). However, "counsel's decisions regarding whether to request special jury charges is inherently one of trial strategy." Taylor v. Cain, Civ. Action No. 07-3929, 2008 WL 4186883, at *9 (E.D. La. Sept. 10, 2008). Again, the United States Supreme Court has cautioned courts not to second-guess counsel's decisions on matters of trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. Further, "a conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it *permeates the entire trial with obvious unfairness.*" St. Aubin v. Quarterman, 470 F.3d 1096, 1102 (5th Cir. 2006) (internal quotation marks and brackets omitted) (emphasis added). There is simply no basis for finding that counsel's failure to request the instruction at issue affected the ultimate fairness of petitioner's trial or in any way influenced the outcome of the trial. Accordingly, this claim fails.[38]

---

[37] State Rec., Vol. I of VII, Judgment dated June 6, 2008, p. 3.

[38] The Court notes that, within petitioner's discussion of his claim, he also suggests that counsel was ineffective for failing to request a special jury charge on self defense. To the extent that petitioner meant those suggestions as an independent claim, that claim likewise has no merit. Petitioner did not testify at trial, and there was no evidence adduced at trial indicating that he acted in self defense. Moreover, that was not the theory of his defense at trial; rather, his defense at trial was that he was misidentified and was not even present at the killing. The Court notes that even

Petitioner also claims that counsel was ineffective for failing to "examine and confront the scientific evidence." Specifically, petitioner opines that counsel should have (1) challenged the hair analysis evidence presented by Officer Tafaro, (2) pursued a lead concerning ballistics evidence, and (3) determined whether gunshot residue testing was done on the victim's hands. In rejecting that claim, the state district court held:

> The complaints that counsel should have further explored the fiber and hair evidence or retained a countervailing expert are unavailing because no evidence was adduced that it would have made any difference had counsel done so. In post-conviction proceedings prejudice cannot be presumed, it must be proven. Because in these respects no proof was offered, this Court cannot grant relief.[39]

For the following reasons, this Court agrees.

First, concerning the hair analysis evidence, defense counsel in fact vigorously contested both the qualifications of Tafaro[40] and the subjective nature of the tests utilized in his analysis.[41] Although the trial court ultimately accepted Tafaro as an expert and allowed his report into evidence, defense counsel's points regarding the reliability of his findings were skillfully made to the jury. Moreover, Tafaro's findings were equivocal at best. He testified that he had compared

---

now petitioner does not suggest that he acted in self defense; rather, his current story is that he *was* present at the shooting but was simply an innocent bystander. In light of all of these considerations, a jury instruction on self defense was not warranted, and, therefore, counsel did not perform deficiently in failing to request one, and petitioner certainly suffered no prejudice from the lack of such an instruction.

[39] State Rec., Vol. I of VII, Judgment dated June 6, 2008, p. 2.

[40] State Rec., Vol. VI of VII, transcript of May 10, 2001, pp. 149-52.

[41] State Rec., Vol. VI of VII, transcript of May 10, 2001, pp. 153-60.

hair taken from the victim's head with hair taken from the truck driven by petitioner and concluded only that they "[c]ould be" from the same person.[42]  Therefore, in Tafaro's opinion, the hair in the truck came from the victim or someone with "similar" hair.[43]  That evidence was hardly compelling, and this Court certainly cannot say that there is a reasonable probability that the result in this case would have been different if only defense counsel had succeeded in having it excluded.[44]

Second, as to the ballistics evidence, there was a question as to whether the gun used to kill the victim was the same gun that was later used in a separate crime committed after petitioner was already in jail.  The police ran ballistics tests and concluded that there was not a positive match.[45]  Petitioner argues that defense counsel should have pursued independent ballistics tests.  However, petitioner has not met his burden to show "what results the scientific tests would have yielded" and that those results would in fact have been favorable to him.  See Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002).  Therefore, he has not shown that he was prejudiced by counsel's failure to secure such testing.

---

[42]  State Rec., Vol. VI of VII, transcript of May 10, 2001, p. 174; see also id. at 175 ("This hair is similar to his and he could have left it in the truck. ... My opinion is the hairs on the left are similar to the known hairs and could have come from the person that the known hairs were taken from.").

[43]  State Rec., Vol. VI of VII, transcript of May 10, 2001, p. 174.

[44]  The Court does not interpret petitioner's claim as arguing that defense counsel should have retained her own expert to challenge the conclusion that the hair in the truck was from the victim. However, if petitioner is making such a claim, it has no merit.  Petitioner candidly acknowledges that the victim was in fact in the truck on the night of the murder.  State Rec., Vol. I of VII, transcript of April 24, 2008, p. 6; see also Rec. Doc. 1-2, p. 28.  Moreover, petitioner has not alleged, much less brought forth evidence to show, that the hair in the truck was not in fact that of the victim.

[45]  See State Rec., Vol. V of VII, transcript of May 15, 2001, pp. 4-6.

Also with respect to this claim, petitioner lastly argues that counsel should have determined whether gunshot residue tests were performed on the victim based on the fact that the autopsy report indicated that there were "[b]rown paper bags covering both hands."[46] That claim is meritless on several grounds. First, there is simply no evidence that counsel failed to make such an inquiry. Second, petitioner has not established that such tests were in fact performed; if they were not, he obviously was not prejudiced by counsel's alleged failure to make such an inquiry. Third, petitioner, who now states that he was present at the killing, does not indicate that the victim had a gun or fired any shots. Therefore, if petitioner is to be believed, any gunshot residue tests would have been negative, and so, again, he would not have been prejudiced by counsel's failure to make the inquiry.

Petitioner next claims that counsel was ineffective for eliciting hearsay testimony. During cross-examination, defense counsel elicited testimony from Detective Doug Eckert that both Casey LeJuene and Steven Bethune had given statements that petitioner confessed to them that he killed Emfinger.[47] In connection with this claim, petitioner argues that counsel should not have elicited this information from *LeJuene*; however, he cites to the portion of the testimony concerning the statement by *Bethune*.[48] Therefore, it is unclear whether petitioner's claim is based on the elicited comment concerning LeJuene, Bethune, or both. Regardless, the claim has no merit. As was noted by Judge Tobias in his concurring opinion denying petitioner's post-conviction writ, this

---

[46]  State Rec., Vol. VI of VII, transcript of May 10, 2001, p. 133.

[47]  State Rec., Vol. VI of VII, transcript of May 10, 2001, pp. 69-72 and 94.

[48]  See Rec. Doc. 1-2, pp. 31-32.

questioning was a part of counsel's trial strategy to show that the testimony regarding petitioner's purported confessions to various individuals was false:

> [A]lthough trial counsel did elicit hearsay evidence regarding the relator's confession, I find that his counsel adopted a strategy of showing the jury that certain alleged confessions by the relator were false; by inference, his counsel hoped that the jury would question whether the relator had made inculpatory statements to Russell, Goldman, and Brewer at all, the three witnesses who the state called to recount alleged inculpatory statements.[49]

As previously noted, such strategic decisions generally are not to be second-guessed on *habeas* review "simply because the chosen strategy has failed." Lake v. Portuondo, 14 Fed. App'x 126, 128 (2nd Cir. 2001). Moreover, in light of the overwhelming evidence of petitioner's guilt, there is simply no basis for finding that counsel's questions on this issue affected the ultimate fairness of petitioner's trial or in any way influenced the outcome of the trial. Accordingly, petitioner has not met his burden to show that he was prejudiced by counsel's strategy.

Petitioner next claims that defense counsel was deficient for eliciting information from a jailhouse informant who shared a cell with petitioner. However, as the state notes in its response, that testimony was elicited by the prosecutor, *not* defense counsel.[50] Therefore, that claim fails as a matter of fact.

Lastly, petitioner argues that even if his contentions regarding counsel's ineffectiveness do not warrant relief when considered individually, relief is warranted when they are

---

[49] State v. Jones, No. 2008-K-1017 (La. App. 4th Cir. Oct. 21, 2008) (Tobias, J., concurring) (unpublished); State Rec., Vol. III of VII.

[50] State Rec., Vol. VI of VII, transcript of May 10, 2001, p. 103.

considered cumulatively. Petitioner is incorrect. Where, as here, the individual contentions are meritless, that result cannot be changed simply by asserting them collectively. Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008), cert. denied, 129 S.Ct. 1544 (2009); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000); Sholes v. Cain, Civ. Action No. 06-1831, 2008 WL 2346151, at *17 (E.D. La. June 6, 2008), aff'd, No. 08-30654, 2010 WL 1141590 (5th Cir. Mar. 25, 2010); Simms v. Cain, Civ. Action No. 07-966, 2008 WL 624073, at *26 (E.D,. La. Mar. 8, 2008); Spicer v. Cain, Civ. Action No. 07-3770, 2007 WL 4532221, at *10 (E.D. La. Dec. 19, 2007); Franklin v. Thompson, Civ. Action No. 07-543, 2007 WL 3046642, at *13 (E.D. La. Oct. 17, 2007). As the United States Fifth Circuit Court of Appeals noted with respect to analogous claims of cumulative error: "Twenty times zero equals zero." Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

In summary, petitioner has failed to demonstrate that the state court's decision denying his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claim.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that petitioner's motion to stay, Rec. Doc. 21, be **DENIED**.

**IT IS FURTHER RECOMMENDED** that petitioner's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[51]

New Orleans, Louisiana, this fifth day of August, 2010.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[51] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.